**Motion for Rehearing Denied; Opinion of February 27, 2025 Withdrawn. Reversed and Rendered and Opinion filed May 20, 2025.**



**In The**

# Fifteenth Court of Appeals

### NO. 15-24-00036-CV

**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND MAX MIDSTREAM, LLC, Appellants**

**V.**

**SAN ANTONIO BAY ESTUARINE WATERKEEPER, TEXAS CAMPAIGN FOR THE ENVIRONMENT, AND S. DIANE WILSON, Appellees**

**On Appeal from the 201st District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-22-002153**

### OPINION

We withdraw our opinion and judgment of February 27, 2025, and substitute the following in its place. The Texas Commission on Environmental Quality (TCEQ or the Commission) granted Max Midstream LLC a minor source air permit to expand its Seahawk Terminal in Calhoun County. Various parties who had opposed Max Midstream's permit application before the agency, including appellees San

Antonio Bay Estuarine Waterkeeper (Waterkeeper), Texas Campaign for the Environment (TCE), and S. Diane Wilson, filed requests for a contested case hearing before the Commission. The Commission denied Appellees' requests and Appellees filed suit for judicial review of the Commission's decision in Travis County District Court. The trial court reversed the bulk of the Commission's decision and remanded the case to the agency for a contested case hearing. Max Midstream and TCEQ appealed the trial court's judgment. We reverse the trial court's judgment and render judgment affirming the Commission's order.

## I. BACKGROUND

### A. The Federal and State Clean Air Acts Set Out Procedures for Review of Air Permits.

The TCEQ regulates air pollution from stationary sources pursuant to a delegation of authority under the Federal Clean Air Act (FCAA). *See* 42 U.S.C. § 7410(a). The FCAA requires the U.S. Environmental Protection Agency (EPA) to identify emissions that cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. *See id*. § 7408(a). The EPA sets primary and secondary National Ambient Air Quality Standards (NAAQS) for certain air pollutants. *See id*. §§ 7408(a), 7409(a)(1). NAAQS are levels of air quality determined to protect the public health and welfare. *Id*. § 7409(b). To implement these standards, each state is required to submit for EPA approval a State Implementation Plan (SIP). *See id*. § 7407(a). Each plan must include a New Source Review (NSR) preconstruction permitting scheme to control emissions from new or modified sources of air pollutants. *See id*. § 7410(a)(2)(C).

The FCAA's and EPA's applicable regulations provide extensive requirements for the construction and modification of "major" sources of air pollution under NSR permitting programs. *See Luminant Generation Co., L.L.C. v.*

2

*E.P.A.*, 675 F.3d 917, 922 (5th Cir. 2012) (citing 40 C.F.R. §§ 51.165–51.166). Major sources are facilities that emit a pre-identified amount, usually 100 tons per year or more, of a regulated contaminant. *See Tex. v. U.S. E.P.A.*, 690 F.3d 670, 675 (5th Cir. 2012) (citing 42 U.S.C. §§ 7479(1), 7602(j) and 40 C.F.R. § 51.166(b)). Minor sources emit less than a pre-identified amount, usually 100 tons per year, of a regulated contaminant after construction or modification. *See U.S. E.P.A.*, 690 F.3d at 675.

Under the FCAA, each state submits a SIP specifying how the state will attain and maintain the NAAQS for EPA approval. 42 U.S.C. § 7407(a). SIPs must include provisions regulating the construction and modification of certain sources of air pollutants. *See, e.g.*, *id.* § 7410(a)(2)(C). Two NSR programs relevant to this case are the Prevention of Significant Deterioration (PSD) program for "major" sources of air pollution and the minor NSR program. *See id*.

The TCEQ administers the requirements of the FCAA for Texas under an EPA-approved SIP that includes a minor-source NSR permitting scheme. *See* 40 C.F.R. § 52.2270. Although the FCAA does not contain specific requirements for evaluating minor sources, the Texas Clean Air Act (Clean Air Act)[1], codified in the Health and Safety Code, requires both major and minor sources to apply the "best available control technology" (BACT)[2] in order to obtain a permit. Tex. Health & Safety Code § 382.0518.

Pursuant to the EPA-approved PSD Program, "[b]efore work is begun on the construction of a new facility or a modification of an existing facility that may emit

---

[1] Unless otherwise noted future references in this opinion to the "Clean Air Act" refer to the Texas Clean Air Act.

[2] BACT is defined as a pollution-control method that "through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions[.]" 30 Tex. Admin. Code § 116.10(1).

air contaminants, the person planning the construction or modification must obtain a permit or permit amendment from the commission." *Id*. § 382.0518(a). The general requirements for a permit are set forth in Title 30 of the Texas Administrative Code, Section 116.111.

When the Executive Director of the TCEQ determines that the permit application is complete, the Commission conducts a technical review of the application to ensure that it meets all applicable rules and requirements. Tex. Health & Safety Code § 382.056(f); 30 Tex. Admin. Code § 116.114. When the technical review is complete, the applicant must publish public notice of the preliminary decision and the availability of a draft permit for public review in newspapers of general circulation and, in some cases, in alternative languages. Tex. Health & Safety Code § 382.056(a), –(b), –(g), –(i); 30 Tex. Admin. Code §§ 39.405, –.419, –.603(a)–(b). In reviewing a PSD permit application, Texas law provides an opportunity for public comment. *See* Tex. Health & Safety Code § 382.056.

After statutorily required public notices are posted, the Commission accepts public comments and responds to all timely, relevant, and material or significant public comments. *See* Tex. Health & Safety Code § 382.056(l); 30 Tex. Admin. Code §§ 55.152, –.156. The Commission must also hold a public meeting if requested by an interested member of the public or a member of the Texas Legislature. Tex. Health & Safety Code § 382.056(k)(1); 30 Tex. Admin. Code § 55.154(c)(1)–(3).

During the notice and public comment period, any person granted party status as an "affected person" may request and participate in contested hearings before the State Office of Administrative Hearings (SOAH). *See* Tex. Health & Safety Code § 382.056(n) (incorporating Tex. Water Code §§ 5.556, 5.557); 30 Tex. Admin. Code §§ 55.201–.211.

4

If a person requests a contested case hearing, the Executive Director considers the hearing requests in accordance with the procedures provided in section 5.556 of the Water Code.[3] *See* Tex. Health & Safety Code § 382.056(n). To grant a contested case hearing the Executive Director must determine that the requestor is an affected person. *See* 30 Tex. Admin. Code § 55.203. The Administrative Procedure Act (APA) allows for judicial review of any permit decision. *See* Tex. Gov't Code § 2001.001, et seq.

## B.  The Commission, Max Midstream, and Appellees Participated in the Permitting Process.

Max Midstream owns and operates the Seahawk Crude Condensate Terminal (Seahawk Terminal) at the Calhoun Port Authority facilities near Port Comfort,

---

[3] Section 5.556 provides:

(a) A person may request that the commission reconsider the executive director's decision or hold a contested case hearing. A request must be filed with the commission during the period provided by commission rule.

(b) The commission shall act on a request during the period provided by commission rule.

(c) The commission may not grant a request for a contested case hearing unless the commission determines that the request was filed by an affected person as defined by Section 5.115.

(d) The commission may not refer an issue to the State Office of Administrative Hearings for a hearing unless the commission determines that the issue:

(1) involves a disputed question of fact;

(2) was raised during the public comment period; and

(3) is relevant and material to the decision on the application.

(e) If the commission grants a request for a contested case hearing it shall:

(1) limit the number and scope of the issues to be referred to the State Office of Administrative Hearings for a hearing; and

(2) consistent with the nature and number of the issues to be considered at the hearing, specify the maximum expected duration of the hearing.

(f) This section does not preclude the commission from holding a hearing if it determines that the public interest warrants doing so.

Texas. The Seahawk Terminal has operated since October 2011 pursuant to a TCEQ permit; Max Midstream acquired the terminal in 2019. On October 6, 2020, Max Midstream submitted its application to the Commission to expand its existing activities at the Seahawk Terminal. Max Midstream sought authorization to increase air emissions from the same types of then-existing permitted air emissions sources. The expansion of the Seahawk Terminal projected new tanks for crude condensate storage, new marine loading docks, and new Vapor Combustion Units (VCUs). The application described the VCUs as devices that "shall achieve 99.9% control of the waste gas directed to it[.]" Because the proposed expansion of the Seahawk Terminal would increase air emissions beyond those permitted by the then-existing permit, the application sought the issuance of a minor NSR permit.

The Executive Director of the Commission conducted a technical review of the application and issued a draft permit. After statutorily required public notices were posted, the Commission received public comments and held a public meeting. The Commission accepted public comments on Max Midstream's application and the Executive Director responded to all timely, relevant, and material or significant public comments.

The Executive Director responded to 18 public comments including comments on air quality; the determination of whether the project triggered major source review; use of BACT; emission rates and calculations; application representations; demonstration of compliance with the permit; flora, fauna, and environmental concerns; water quality; greenhouse gases; expedited permitting; safety; compliance history of Max Midstream; public participation in the public meeting; environmental justice; jurisdictional issues; and the Commission's responsibility to the community. The Executive Director also responded to comments about contested case hearings and explained the process for requesting a

hearing and the necessity that the requestors demonstrate that they are affected persons under the Health and Safety Code.

The Commission received more than 2500 timely requests for contested case hearings during the public comment period. As applicable to this appeal the Commission received hearing requests from Appellees TCE, Waterkeeper, and Wilson. To support their requests for a hearing, Appellees asserted the following:

> ***Diane Wilson, individually and as a member of Waterkeeper***, alleged that she was affected by the modification to the Seahawk Terminal and entitled to a contested case hearing due to her routine visits to bodies of water near the Seahawk Terminal. As part of Wilson's work with Waterkeeper she visits these bodies of water to observe whether plastic pellets, powder, or flakes have been discharged from the Formosa Plastics facility in Point Comfort, Texas. During each of the trips Wilson is outdoors in a kayak, motorboat, or on foot between four and six hours. Wilson performs this work to monitor Formosa's compliance with an unrelated consent decree. Wilson visited the bodies of water three times in the previous four months. She identified one location as being "roughly 1300 feet" from the Seahawk Terminal. Wilson identified other areas she visited approximately as 1.85 miles and two miles from the terminal. She visited those areas once every two months. Wilson visits several other areas within five miles of the terminal once per week.
>
> Wilson lives within 15 miles of the Seahawk Terminal, and alleged she would be exposed to increased air pollution if the application for permit was approved. On behalf of Waterkeeper, she averred that members walk the beaches of Lavaca Bay and swim and boat in its waters. They worry that increased air pollution from the proposed expansion project will negatively affect their health, the health of their families, and interfere with the use and enjoyment of their property. Wilson worked as a commercial fisherman, shrimper, oysterman, fin fisher, and as a manager at a fish house. Though retired she relies on the fishing and shrimping industry and alleged her "deep connection with the waters and trades" encompassed interests not shared by the general public.
>
> ***Curtis Miller as a member of Waterkeeper and TCE*** alleged that he was an affected person entitled to a contested case hearing as an owner

and operator of a seafood company located approximately 4.8 miles from the Seahawk Terminal. Miller owns four commercial fishing boats on which he occasionally works but are mostly crewed by paid staff. Miller alleged that the dredging of Matagorda Ship Channel to accommodate larger crude tankers exporting oil from the Seahawk Terminal would impact oyster habitats, which would negatively impact Miller's business. Miller further alleged he would be impacted by air emissions from the terminal expansion as he spends 50-60 hours per week at his business. He also fishes one to two times per month from a reef located just over two miles from the Seahawk Terminal. Miller suffers from asthma and other respiratory issues he alleged will become worse with expansion of the terminal. Carbon dioxide emissions from the expanded terminal will contribute to the acidification of coastal waters, which is known to negatively impact oysters.

***Maurice Blanco, also a member of Waterkeeper and TCE***, lives approximately five miles from the Seahawk Terminal. Blanco alleged he was an affected person entitled to a contested case hearing because he has made a living shrimping and oystering in Matagorda and Lavaca Bays for approximately 30 years. Blanco is concerned that air pollution from the expanded terminal will interfere with his livelihood and threaten his health and well-being along with the health and well-being of his family and the local fishing community.

***John and Janet Maresh, members of Waterkeeper***, live approximately 1.79 miles from the Seahawk Terminal. They are concerned that the proposed expansion of the terminal will contribute to existing air pollution problems and potentially "push the area into non-attainment for [NAAQS]." They are concerned that the "thick acrid smog" that occasionally settles over Point Comfort could be made worse if the expansion project was authorized by TCEQ. The Mareshes alleged they were affected persons entitled to a contested case hearing because the air pollution caused by the expansion of the Seahawk Terminal "may cause them deleterious health impacts[.]"

The Executive Director, Max Midstream, and the Commission's Office of Public Interest Counsel responded to Appellees' requests for hearings. The Executive Director considered the hearing requests in accordance with the procedures provided in section 5.556 of the Water Code. *See* Tex. Health & Safety

Code § 382.056(n).

Attached to Max Midstream's response was the affidavit of Dr. Lucy Fraiser, a toxicologist who performs air quality health and welfare evaluations. Fraiser reviewed several documents related to the permit application including Appellees' comments and hearing requests. Fraiser conducted an analysis of the potential air quality effects of the Seahawk Terminal expansion, which included a review of air dispersion modeling to predict concentrations of pollutants from the proposed facility. Fraiser concluded that the proposed emissions from the Seahawk Terminal do not pose an adverse health or welfare effect because of the small magnitude of the modeled maximum ground level contaminants and the "highly conservative nature" of the TCEQ-derived effects screening level, which are designed to be protective of public health and welfare. Fraiser further concluded that impacts on public health and welfare farther than one mile from the terminal "would be indiscernible." At greater distances than one mile from the terminal, potential impacts "are expected to be even less."

Addressing the individuals who had sought contested case hearings, Fraiser noted that all of the locations that Wilson visited are more than one mile from the Seahawk Terminal except for the Formosa Outfalls 011 and 013. Based on the modeling and Fraiser's evaluation, Fraiser determined that Wilson would not experience impacts from visiting those locations that are more than one mile from the terminal. Fraiser also determined that exposure alone would not result in possible negative effects unless the exposure was of sufficient magnitude, duration, and frequency to cause impacts. Given the infrequency and short duration that Wilson reported being present in the areas less than one mile from the terminal, Fraiser did not expect Wilson to experience discernible impacts from any pollutant for which authorization was requested by the application. Fraiser acknowledged that there

were competing affidavits disputing the precise location of Formosa Outfalls 011 and 013. Fraiser explained that her conclusions were the same regardless of which affidavit was correct with respect to the location.

Appellees replied to Max Midstream's response, attaching affidavits of Dr. Ranajit Sahu, a public health statistician, Dr. Loren Hopkins, and Blanco, a member of Waterkeeper and TCE. Hopkins opined that Seahawk Terminal emissions would adversely affect persons who lived, recreated, or worked within two miles of the terminal and that the health impacts would be especially harmful to individuals who experienced pre-existing respiratory illnesses. Sahu asserted that emissions from the terminal were expected to extend as far as five miles from the Seahawk Terminal and that Max Midstream's application understated the level of expected emissions. Blanco provided coordinates for where he oystered and shrimped with distances ranging between 1.38 miles and 2.32 miles from the Seahawk Terminal.

The Commission considered the requests for contested case hearings, the responses, and the replies during its open meeting. The Commission evaluated the requests for hearing under the applicable statutes and Commission regulations and denied all requests for hearing. The Commission further approved Max Midstream's application for air quality permit and adopted the Executive Director's response to public comment.

## C.    Appellees Appealed the Commission's Decision to the Trial Court.

After a timely filed motion for rehearing was denied by operation of law, Appellees filed a petition for judicial review in the trial court. In the trial court Appellees asserted the Commission erred in (1) denying their requests for a contested case hearing; and (2) issuing the air permit to Max Midstream.

Appellees asserted the Commission's denial of their contested case hearing

10

requests was invalid, arbitrary, or unreasonable because they demonstrated they are affected persons and they satisfy federal Article III standing criteria based on their use of property, likely harms to health and safety, and/or recreational and aesthetic interests. Appellees also asserted the Commission's decision to issue a minor source air permit to Max Midstream was invalid, arbitrary, or unreasonable because the Commission applied the wrong legal standard for a minor versus a major source. In the alternative, Appellees asserted the Commission's decision to issue a minor source permit was invalid, arbitrary, or unreasonable because the Seahawk Terminal's potential to emit certain pollutants exceeds the applicable major source threshold.

The Commission and Max Midstream responded to Appellees' petition and asserted that the Commission's determination that Appellees were not affected persons and therefore not entitled to a contested case hearing was supported by substantial evidence pursuant to applicable statutes, Commission regulations, policies, and the Administrative Record. In response to Appellees' cause of action contesting the issuance of the minor source air permit, the Commission filed a plea to the jurisdiction in which it asserted that the trial court lacked jurisdiction to consider Appellees' challenge to the issuance of the air permit because they were not admitted as affected persons with standing to challenge the permit. Because Appellees were not parties they were unable to exhaust administrative remedies required for judicial review.

The trial court held a hearing at which the parties argued their respective positions and the Administrative Record was admitted into evidence. The trial court subsequently reversed the decision of the Commission denying the hearing requests and approving and issuing the permit. The trial court remanded to the Commission for a contested case hearing. This appeal followed.

11

## II. ANALYSIS

The Commission and Max Midstream each filed a brief in this appeal. Both parties assert the same first issue challenging the trial court's reversal of the Commission's order denying Appellees' requests for a contested case hearing arguing the Commission's decision was supported by substantial evidence. Both parties also assert that Appellees cannot directly challenge the Commission's issuance of the air permit in this proceeding. The Commission also challenges the trial court's order on remand as a violation of separation of powers.

## A. Standard of Review and Governing Law

A person affected by a ruling, order, decision, or other act of the Commission or of the Executive Director may appeal the action by filing a petition in a district court of Travis County. Tex. Health & Safety Code § 382.032(a). On appeal, the focus of this Court's review, as in the trial court, is on the decision of the Commission. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000).

In the appeal of a Commission decision governed by the Clean Air Act, other than cancellation or suspension of a variance, we determine whether the decision is invalid, arbitrary, or unreasonable. *See* Tex. Health & Safety Code § 382.032(e). All parties agree that the Commission's affected person regulations embody federal Article III standing requirements. The parties disagree, however, on whether that standard encompasses the substantial evidence standard of review. Appellees assert that under Article III standing requirements, the Commission may not weigh and resolve disputed fact issues in determining affected-person status. We therefore first determine what standard of review applies to the Commission's denial of a contested case hearing and whether in making that determination the Commission may weigh and resolve disputed facts.

12

Judicial review of administrative agency decisions is generally governed by the APA, which addresses contested-case proceedings and the framework of the substantial-evidence test. *See* Tex. Gov't Code §§ 2001.001–.902; *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 17 (Tex. 2000). The Texas Supreme Court recognized and specifically extended the substantial-evidence standard in the APA to Commission decisions on contested case hearing requests, specifically including air permit applications. *Tex. Comm'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 424–25 (Tex. 2013). The Water Code clearly outlines the statutory procedure the Commission must follow in determining affected-person status, and the Commission has no authority to depart from this procedure. Tex. Water Code §§ 5.115, 5.556. Because there is a record that is the basis of agency action—the fundamental requirement for a substantial-evidence review—we conclude the standard of review in this case is pursuant to substantial-evidence review.

"Review under the substantial-evidence rule is highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020). Only in narrow circumstances will an agency decision be reversed as "arbitrary and capricious" when it is supported by substantial evidence. *See Tex. Health Facilities Comm'n v. Charter Med., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984) ("In enacting the APTRA, it is clear that the legislature intended to distinguish between agency action that is not supported by substantial evidence and agency action that is arbitrary and capricious."). The evidence "may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Id*. at 452. This rule precludes courts from "usurping the agency's adjudicative authority even though the court would have struck a different balance." *Riou*, 598 S.W.3d at 251 (quoting *Tex. State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 117

13

(Tex. 1988)). "In upholding an agency's determination, a reviewing court is not bound by the agency's reasons for its decision when a valid basis exists for the action taken." *Riou*, 598 S.W.3d at 251 (citing *Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914 (Tex. 2004)).

## B. Substantial Evidence Supports the Commission's Denial of Affected Person Status.

The Commission and Max Midstream assert in their first issue that the Commission's decision denying Appellees' requests for a contested case hearing was supported by substantial evidence and based on applicable law and decision making.

A contested case hearing must not be granted unless it is requested by an "affected person." Tex. Water Code § 5.556(c). The Water Code defines an "affected person" as "a person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing." Tex. Water Code § 5.115(a). An interest common to members of the general public does not qualify as a personal justiciable interest. *Id*.

In applying the personal justiciable interest test to determine if a hearing requestor is an affected person, the Commission must consider the following factors:

(1) whether the interest claimed is one protected by the law under which the application will be considered;

(2) distance restrictions or other limitations imposed by law on the affected interest;

(3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

(4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

(5) likely impact of the regulated activity on use of the impacted natural resource by the person;

14

(6) for a hearing request on an application filed on or after September 1, 2015, whether the requestor timely submitted comments on the application that were not withdrawn; and

(7) for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code § 55.203(c).

In addition, for the application in this case, filed after September 1, 2015, the Commission may consider additional factors in determining whether a person is an affected person:

(1) The merits of the underlying application and supporting documentation in the Commission's administrative record, including whether the application meets the requirements for permit issuance;

(2) The analysis and opinions of the Executive Director; and

(3) Any other expert reports, affidavits, opinions, or data submitted by the executive director, the applicant, or hearing requestor.

*Id.* § 55.203(d).

An individual seeking party status as an affected person entitled to a contested case hearing must identify his or her personal justiciable interest affected by the application—including the location and distance relative to the proposed facility—and explain how that interest will be adversely affected in a manner not common to members of the general public. 30 Tex. Admin. Code § 55.201(d)(2). Likewise, groups or associations, such as Waterkeeper and TCE, must also identify, "by name and physical address in a timely request for a contested case hearing, a member of the group or association who would be an affected person in the person's own right[.]" Tex. Water Code § 5.115(a-1)(2)(A). A person seeking to be admitted as a party has the burden of making a minimum jurisdictional showing of a justiciable interest. *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008). To have a justiciable interest, the complainant must show that a concrete, particularized,

15

actual or imminent injury faces him or her due to the decision; a hypothetical or speculative injury is not enough. *Id*.

The Commission made its decision based on expert affidavits and modeling, which concluded that conservative estimates of emissions from proposed sources will be sufficiently attenuated by dispersion such that they will not present danger to the health or welfare of the Appellees at the distances from which Appellees either reside or recreate. The Commission considered the required factors listed above and determined that Appellees did not meet their burden to show they were affected persons. We review whether substantial evidence supports the Commission's decision in light of the required factors.

1. **Substantial Evidence Supports the Commission's Decision on the Basis of Health and Safety Concerns.**

The Commission's decision that Appellees were not entitled to a contested case hearing is supported by substantial record evidence establishing that operations under the terms of the permit will be protective of human health and will not discernibly impact Appellees. This evidence includes reviews conducted by the Executive Director including the health effects review conducted by the Toxicology, Risk Assessment, and Research Division of the Office of the Executive Director. The health effects review concluded that due to the rural nature of the property surrounding the Seahawk Terminal and the conservative nature of the predicted pollutants, the predicted short- and long-term emissions are allowable. In addition, two air quality analysis audits were conducted, which showed acceptable air quality for all pollutants.

Those documents aided the Commission in determining the expected geographical area that may be impacted by health and safety or other concerns as a result of emissions from the proposed expansion of the terminal. In the Executive

16

Director's response to comments, the director stated that based on the staff review, it was not expected that "existing health conditions will worsen, or that there will be adverse health effects on the general public, sensitive subgroups, or the public welfare and the environment as a result of proposed emission rates associated with this project."

Max Midstream also presented evidence to the Commission in the form of expert affidavits, maps, and other documents related to health and safety effects and Appellees' respective locations. As stated above, Max Midstream's expert, Dr. Fraiser, reviewed the locations of the Appellees' residences, places of business, and preferred recreational areas and determined that the permitted emissions from the Seahawk Terminal would be a fraction of the conservative state and federal air quality standards, which are designed to be protective of public health and welfare. Fraiser further concluded that impacts on public health and welfare at distances greater than one mile would be indiscernible.

Appellees contradicted this evidence with affidavits from its expert, Dr. Sahu, who stated that quantifiable air quality impacts would likely extend as far away as five miles from the Seahawk Terminal because Max Midstream's application understated the true quantity of emissions. Sahu predicted that impacts from pollution emitted from the terminal would be significantly greater than the impacts predicted and demonstrated by Max Midstream.

In contrast, Fraiser explained that exposure to pollutants from the Seahawk Terminal would not result in negative effects to Appellees unless exposure was of sufficient "magnitude, duration, and frequency to cause impacts." Fraiser reviewed the reported activities of Appellees, the length of time they spent in particular places, and the distance from the terminal and determined Appellees' potential exposure was not of a greater magnitude, duration, and frequency to cause health and safety

17

impacts significantly greater than the general public.

As the Commission is vested with discretion to weigh conflicting evidence, it was within the Commission's discretion to conclude that Appellees are not affected persons because the permitted activity will have a minimal effect on their health and safety. *See* 30 Tex. Admin. Code § 55.256.

### 2. Substantial Evidence Supports the Commission's Decision on the Basis of Use and Enjoyment of Property.

Appellees alleged that "increased air pollution and industrial activity related to the Seahawk Terminal will diminish the Mareshes' use and enjoyment of their property." The Mareshes filed a request for hearing as members of Waterkeeper. Although the Mareshes did not provide an address on their application, as required by the Texas Administrative Code, the request states their residence is 1.79 miles from the Seahawk Terminal. *See* 30 Tex. Admin. Code § 55.205(b)(2).

Both the Executive Director and Dr. Fraiser concluded that individuals as far away as the Mareshes would not experience a discernible impact on the use and enjoyment of their property. Again, Appellees' experts stated otherwise. It was within the Commission's discretion to deny Waterkeeper party status as the Mareshes did not meet their burden to establish they had a justiciable interest not common to members of the general public. *See* Tex. Water Code § 5.115.

### 3. Substantial Evidence Supports the Commission's Decision on the Basis of Use of the Natural Resource.

Appellees asserted recreational and aesthetic claims but did not meet their burden to establish that the permitted activity would affect them differently than members of the general public.

Wilson alleged she regularly engages in recreational activities such as swimming, kayaking, and boating in Lavaca and Matagorda Bays. Wilson asserted

her enjoyment of these recreational activities and aesthetic beauty of the area would be diminished by increased exposure to air pollution. The Commission reviewed the affidavit of Tony Nguyen, a Senior Vice President at Max Midstream responsible for identifying and complying with regulatory requirements for Max Midstream. Nguyen reviewed maps and a list of locations where Appellees reported they participated in recreational activities. According to Nguyen, the Bays identified by Wilson where she swims, kayaks, and boats are approximately eight miles away from the Seahawk Terminal. Those Bays are also open to the public and generally accessible to anyone. Wilson, therefore did not meet her burden to show that her enjoyment of recreational activities and aesthetic beauty was not common to members of the general public.

Miller, a member of Waterkeeper and TCE, alleged that he fishes once or twice a month at a location just over two miles from the Seahawk Terminal. According to Fraiser's affidavit, at a location two miles from the Seahawk Terminal, an individual would not experience discernible impacts from emissions. In addition, Miller did not meet his burden to establish that potential impacts on his recreational activities would be different from potential impacts to the general public.

As to aesthetic concerns, the Mareshes expressed concern that the emissions would "reshape and degrade the local landscape, destroy native wildlife habitat, and threaten sensitive ecosystems." The Mareshes also expressed concern that occasional smog outbreaks may worsen with increased emissions. The Mareshes did not meet their burden to establish that their environmental and aesthetic concerns differ from the concerns experienced by the general public. A "personal justiciable interest" not common to members of the "general public" is the cornerstone of Section 5.115's "affected person" definition. *See* Tex. Water Code § 5.115.

4. **Substantial Evidence Supports the Commission's Decision on the Basis of Use of Economic Interests.**

Blanco and Miller, both members of Waterkeeper and TCE, alleged party status as affected persons due to the potential impact on their livelihoods shrimping and oystering. Both individuals shrimp and oyster in Matagorda and Lavaca Bays, eight miles away from the Seahawk Terminal. Miller alleged that the dredging of the Matagorda Ship Channel to accommodate larger crude tankers exporting oil from the Seahawk Terminal would impact oyster habitats, which would negatively impact Miller's business. Miller suffers from asthma and other respiratory issues he alleged will become worse with expansion of the terminal. Carbon dioxide emissions from the expanded terminal will contribute to the acidification of coastal waters, which Miller alleged is known to negatively impact oysters.

Initially we note that the potential dredging of the Bays is not at issue in this case. The Commission specifically reviewed air emissions and granted a minor source permit based on its own review and other experts' evaluations. To have a justiciable interest and establish standing as an affected person Blanco and Miller were required to show the perceived injury from air emissions to their business was concrete, particularized, actual, or imminent. *See DaimlerChrysler Corp.*, 252 S.W.3d at 304–05; *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex.1995) (stating that a justiciable controversy exists when there is a real and substantial conflict of tangible interests and not merely a theoretical dispute). The injury Miller describes that could potentially be affected by air emissions is the "acidification of coastal waters," which Miller alleges is "known to negatively impact oysters." Each of the purported economic injuries alleged by Blanco and Miller are merely speculation and were not supported by evidence before the Commission or the trial court.

To be sure, Appellees' expert Dr. Hopkins stated that exposure to certain pollutants could aggravate respiratory diseases such as those from which Miller suffers. Hopkins' statement, however, was contradicted by the affidavit of Fraiser who stated that impacts from air emissions at distances greater than one mile would be indiscernible. The Commission acted within its discretion in denying Waterkeeper and TCE party status as affected persons.

We hold that substantial evidence supported the Commission's decision to deny a contested case hearing. Because Appellees failed to demonstrate any likely adverse impact on, or any concrete or imminent injury to, their own personal health or safety different from that experienced by the general public, the Commission was required by law to deny their requests for a hearing. *See* Tex. Water Code § 5.556(c); 30 Tex. Admin. Code §§ 55.201(b), 55.211(c)(2).

## C. Appellees did not Establish that the Commission's Decision was Arbitrary and Capricious.

An agency decision may be reversed as arbitrary and capricious, independent of whether there is substantial evidence in the record, if its decision constitutes a clear abuse of discretion. *See Dyer v. Tex. Comm'n on Envtl. Quality*, 646 S.W.3d 498, 505 (Tex. 2022) (citing Tex. Gov't Code § 2001.174). An agency's decision is arbitrary if the agency: (1) failed to consider a factor the Legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the Legislature directs it to consider but still reaches a completely unreasonable result. *Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021).

In the trial court Appellees asserted the Commission's decision was arbitrary and capricious for three reasons: (1) Article III prohibits resolving the merits at the standing phase of a proceeding; (2) the Commission applied an arbitrary, uncodified

21

"one mile test" for determining whether Appellees were affected persons; and (3) the Commission applied the wrong legal standard for what constitutes a particularized interest.

### 1. The Legislature Granted the Commission Discretion to Resolve Disputed Facts when Determining Affected-Person Status.

Appellees contend that they are entitled to affected-person status under Article III federal standing requirements if they raise a fact issue on whether they suffered a particularized injury. In other words, Appellees argue the Commission has no discretion to resolve disputed issues of fact when reviewing whether to grant party status to affected persons.

The Commission's discretion to grant or deny permit applications arises from a legislative grant of exclusive jurisdiction over specific permits for regulated activities—here the exclusive jurisdiction to issue air quality permits. *See* Tex. Health & Safety Code § 382.051. The Water Code clearly outlines the statutory procedure the Commission must follow in determining affected-person status, and the Commission has no authority to depart from this procedure. Tex. Water Code §§ 5.115, 5.556. The statute confers discretion on the Commission to weigh and resolve disputed facts in determining the need for a contested case hearing. *City of Waco*, 413 S.W.3d at 424–25.

The Commission therefore did not abuse its discretion in reviewing competing evidence and resolving fact issues in its determination of whether Appellees were affected persons under the statute.

### 2. The Administrative Record Does Not Support Application of an Arbitrary "One Mile Test."

The Commission is required to consider distance restrictions on the affected interest asserted by a person seeking party status. 30 Tex. Admin. Code

22

§ 55.203(c)(2) (listing distance restrictions as a factor to be considered). In addition to distance restrictions, the Commission is required to consider whether a reasonable relationship exists between the interest claimed and the activity regulated; the likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person; and the likely impact of the regulated activity on use of the impacted natural resource by the person. *Id*. § 55.203(c).

Appellees presented no evidence, however, that the Commission considered an arbitrary one-mile test rather than the factors required by the Administrative Code. In its brief in the trial court, Max Midstream included a statement from one of the TCEQ commissioners in which the commissioner specifically expressed that "the Commission has not created a one (1) mile standard to determine affectedness." [CR 165] Appellees did not present evidence to the contrary. The Administrative Record reflects that the Commission considered the appropriate factors required by its regulations and did not apply those factors in an arbitrary and capricious manner. *See Pub. Util. Comm'n of Tex.*, 620 S.W.3d at 430 (agency's decision was not arbitrary and capricious because it considered appropriate factors in setting a standard and "adhered to the standard it set forth.").

In Fraiser's affidavit, she noted that applicants for air permit applications use air dispersion modeling to predict concentrations of pollutants from proposed facilities at certain receptors where the Commission has identified as locations "where the public could be exposed to an air contaminant in the ambient air." Fraiser recognized that the concentration of a pollutant to which a member of the public is potentially exposed is critical to determining whether adverse health and welfare effects will occur. In a detailed analysis applying her expertise in air dispersion models and the conservative standards set by both state and federal governments, Fraiser determined that "[i]mpacts on public health and welfare further than 1 mile

would be indiscernible." Fraiser went on to conclude that even the locations visited by Wilson that may be within one mile of the proposed facility would not present a discernible impact on Wilson's health because of the infrequency and short duration of Wilson's visits to the Formosa plastics facilities. In reviewing Fraiser's analysis of the proposed emissions, the record does not reflect that the Commission based its decision to deny affected person status on an arbitrary one-mile test.

3. **The Commission Applied the Proper Standard in Determining Whether Appellees Asserted Justiciable Interests in Their Recreational and Aesthetic Interests.**

Citing cases from federal circuit courts applying federal law, Appellees argue they were not required to establish that their environmental and aesthetic concerns differ from the concerns experienced by the general public. However, the remedy sought by Appellees—a contested case hearing—is a remedy created and defined by state statute. *See* Tex. Health & Safety Code § 382.056(n) (incorporating Tex. Water Code §§ 5.556, 5.557). A "personal justiciable interest" not common to members of the "general public" is the cornerstone of section 5.115's affected-person definition. *See* Tex. Water Code § 5.115(a). The Commission acted within its legislatively granted authority when determining that Appellees were not affected persons entitled to a hearing.

The federal cases cited by Appellees involved federal citizen actions and federal rulemaking challenges.[4] By applying the standard in the Texas Clean Air Act, the Commission did not act arbitrarily and capriciously and did not abuse its

---

[4] *See e.g., Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (member of association met case-or-controversy requirement under the Federal Clean Air Act); *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1067 (9th Cir. 2014) (challenge to Nevada's SIP under the Federal Clean Air Act); *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005) (reviewing citizen standing under Federal Clean Air Act); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005) (federal citizen standing to challenge impact of plant on visibility).

discretion in determining that Appellees lacked affected-person status that would entitle them to a contested case hearing.

Substantial evidence supports the Commission's determination that Appellees were not entitled to a contested case hearing. We further conclude the Commission did not abuse its discretion in denying the requests for a contested case hearing and did not act arbitrarily and capriciously. We therefore sustain the Commission and Max Midstream's first issues on appeal.

## D.    This Court Lacks Jurisdiction to Consider Appellees' Challenge to the Merits of the Air Permit.

In their second issue, TCEQ and Max Midstream allege that this Court lacks jurisdiction to consider a challenge to the merits of the Commission's issuance of the permit. We agree.

In the trial court, Appellees asserted they had a right to judicial review of the Commission's final order granting the permit to Max Midstream. [CR 305] The Commission filed a plea to the jurisdiction in which it asserted that the trial court lacked jurisdiction to consider Appellees' challenge on the merits because (1) Appellees lacked standing not having been admitted as affected or aggrieved parties; and (2) since Appellees were not parties, they did not adjudicate the permit's merits, and failed to exhaust administrative remedies required for judicial review. [CR 127-29] The trial court did not reach this issue because it determined Appellees were entitled to a contested case hearing. Even though the trial court did not reach the issue, we address this issue because it impacts subject matter jurisdiction. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 868 (Tex. 2023). Because this is a jurisdictional question, we review it de novo. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222 (Tex. 2002).

The APA provides that "[a] person who has exhausted all administrative

25

remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." Tex. Gov't Code § 2001.171. The APA creates a right to judicial review for those who satisfy the section's threshold requirements, but the statute does not create an inherent right to judicial review. *Texas Dep't of Protective & Regul. Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 172; 196 (Tex. 2004). TCEQ and Max Midstream assert in this case that exhaustion of remedies is required and Appellees failed to exhaust their administrative remedies.

In addressing whether exhaustion of administrative remedies is required, we begin with the presumption that courts have jurisdiction to resolve legal disputes. *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 617 (Tex. 2023). A party may overcome that presumption by establishing that the Constitution or another law grants exclusive jurisdiction to another court or an administrative agency. *Id*. "A statute may grant an agency exclusive jurisdiction either expressly or by establishing a 'pervasive regulatory scheme' that impliedly 'indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.'" *Id*. (quoting *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018)). A state agency has exclusive jurisdiction when the Legislature grants it sole authority to make an initial determination in "disputes that arise within the agency's regulatory arena." *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016).

To establish exclusive agency jurisdiction over a particular issue and thus require exhaustion of administrative remedies, there must be (1) an express or implied grant of exclusive jurisdiction, and (2) the issue must fall within that jurisdictional scope. *CPS Energy*, 671 S.W.3d at 617. If the agency has exclusive jurisdiction over a particular issue, a trial court lacks jurisdiction over a claim

involving that issue until the claimant has exhausted all available administrative remedies. *Hensley v. State Comm'n on Judicial Conduct*, 692 S.W.3d 184, 194 (Tex. 2024).

The Commission has exclusive jurisdiction over air quality permits, such as the one issued to Max Midstream. Tex. Health & Safety Code § 382.051. The Legislature has also provided an exclusive administrative remedy by which parties can challenge the Commission's permitting decisions and the factual bases for them—the contested case hearing. Tex. Water Code § 5.556(a); *see* Tex. Health & Safety Code § 382.056(n) (providing for public hearing in accordance with Water Code procedures). The Legislature has not chosen to make contested case hearings available to the general public. To invoke this remedy, a party must be an "affected person" within the meaning of Water Code section 5.115. Tex. Water Code § 5.556(a).

Because the Commission has exclusive original jurisdiction over this dispute and the Legislature has provided for the contested case hearing remedy, Appellees were required to fully participate in that hearing before seeking judicial review on the merits of Max Midstream's permit application. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006) (concluding that when "an administrative body has exclusive jurisdiction to make the initial determination in a dispute, a party must exhaust all administrative remedies before seeking judicial review of the decision," so "[u]ntil the party has satisfied this exhaustion requirement, the trial court lacks subject matter jurisdiction."). Only a party that has exhausted all available administrative remedies may seek judicial review of an agency decision. *Tex. Water Comm'n v. Dellana*, 849 S.W.2d 808, 810 (Tex. 1993).

A statutory prerequisite to suit is jurisdictional. Tex. Gov't Code § 311.034. Admission as an affected person to participate in a contested case hearing is a

jurisdictional prerequisite to judicial review of a Commission decision to grant an air permit. *See* Tex. Gov't Code § 2001.171; *Sierra Club & Pub. Citizen v. Tex. Comm'n on Envtl. Quality*, No. 03-14-00130-CV, 2016 WL 1304928, at \*4 (Tex. App.—Austin Mar. 31, 2016, no pet.) (mem. op.).

Appellees contend that admission as affected persons and a contested case hearing are not prerequisites for judicial review for three reasons, which we address in turn.

### 1. Health and Safety Code Section 382.032 Does Not Provide an Independent Avenue for Judicial Review.

Appellees first argue they have a statutory right to judicial review under Section 382.032(a) of the Health and Safety Code, which provides:

> A person affected by a ruling, order, decision, or other act of the commission or of the executive director, *if an appeal to the commission is not provided*, may appeal the action by filing a petition in a district court of Travis County.

Tex. Health & Safety Code § 382.032(a) (emphasis added).

Appellees argue that the Health and Safety Code, not the APA, is the appropriate avenue for judicial review of the air permit because it is more specific and "is not silent on judicial review." Citing *TXI Operations LP v. Tex. Comm'n on Envtl. Quality*, 665 S.W.3d 203, 211 (Tex. App.—Austin 2023, pet. denied), Appellees contend that Section 382.032 controls over the more general Water Code provision requiring a contested case hearing. Indeed, the Third Court of Appeals held that Section 382.032 controls over a more general Water Code provision, but that court also held that Section 382.032 only allows direct judicial review if an appeal to the commission is not provided. *Id.* at 209 (concluding that where an appeal is provided, a party affected by the decision must first appeal to the Commission "and only afterwards may seek judicial review of the Commission's order disposing

of that appeal"). Section 382.032 does not provide an avenue for direct appeal of a permit by a party who did not participate in a contested case hearing. Consequently, participation in a contested case hearing is a prerequisite to judicial review because the Commission must have the first opportunity to hear and decide the merits through adjudication. *See Sierra Club*, 2016 WL 1304928, at *4 ("Because TCEQ has exclusive original jurisdiction over this dispute and the Legislature has provided for the contested case hearing remedy, appellants were required to fully participate in that hearing before seeking judicial review").

## 2. Appellees Did Not Exhaust All Administrative Remedies.

Appellees further contend they exhausted all available administrative remedies by filing a motion for rehearing. To the contrary, under the regulatory scheme created by the Legislature, participation in a contested case hearing on the merits of the proposed permit was a necessary step and is required for exhaustion of remedies. A motion for rehearing is one of the administrative remedies that, under the APA, must be exhausted before seeking judicial review, but it is not the only remedy. *See Mosley v. Tex. Health & Human Services Comm'n*, 593 S.W.3d 250, 260 (Tex. 2019). The plain language of the APA requires that a person seeking judicial review be "aggrieved by a final decision in a contested case." Tex. Gov't Code § 2001.171. Appellees were not admitted as affected persons and did not participate in a contested case hearing. Therefore, not having been aggrieved by a final decision in a contested case, Appellees did not exhaust administrative remedies by filing a motion for rehearing.

## 3. TCEQ's Statements to the EPA in a Rulemaking Proceeding Do Not Dispense with the Requirement of Exhaustion of Remedies.

Appellees contend that requiring exhaustion of remedies in this case contradicts prior Commission statements made when adopting amendments to the

agency's rules in 2015. *See* 40 Tex. Reg. 9651, 9654 (Dec. 25, 2015). Appellees rely on a portion of the Commission's statements in which the TCEQ responded to the EPA's comment on whether participation in a contested case hearing was a prerequisite for review. TCEQ responded, "Requesting or participating in a [contested case hearing] is not a prerequisite to judicial review in Texas, provided the person exhausted their administrative remedies prior to requesting judicial review." *Id*. The Commission responds that Appellees took this sentence out of context and that the scope of judicial review varies with the type of action under review.

As an example, the Commission rules provide a limited opportunity to challenge the differences between a draft permit and one finally approved under the general provisions governing requests for reconsideration or a contested case hearing. *See* 30 Tex. Admin. Code § 55.201(h). Other examples include proceedings that do not provide a right to a contested case hearing such as permits for certain controls for concrete batch plants. *See* Tex. Health & Safety Code § 382.05199. Other permit actions under the Water Code and Health and Safety Code do not require participation in a contested case hearing because one is not available in some instances. *See generally* Tex. Water Code § 5.351; Tex. Health & Safety Code § 382.032. The Commission's statements in the rule preamble demonstrate that judicial review is available without a contested case hearing in some scenarios. But when a contested case hearing is available, a person must participate in a contested case hearing to exhaust available administrative remedies on the contested issues. This statement is consistent with Health and Safety Code Section 382.032 as reviewed above and Supreme Court authority. *See Tex. Nat. Res. Conservation Comm'n v. Sierra Club*, 70 S.W.3d 809, 812 (Tex. 2002) (reasoning that when the agency's enabling legislation and the APA do not conflict, the court gives effect to

30

both).

The Third Court of Appeals's opinion in *Texas Commissioner of Education v. Solis* is not to the contrary. 562 S.W.3d 591, 597–98, 602 (Tex. App.—Austin 2018, pet. denied). In that case, the Third Court of Appeals held that a teacher did not need to complete the local grievance procedure with the school district before she could appeal to the Commissioner of Education. *Id.* at 602. This was because the relevant statute requiring exhaustion of remedies did not limit appeals to review of the school district board of trustees' decisions that were made pursuant to a grievance proceeding, but simply required the Commissioner to base his decision on the record as it existed at the district level. *Solis* acknowledged and reaffirmed the longstanding requirement of exhaustion of administrative remedies at the agency level before seeking judicial review. *Id.* at 597–98. But here, Appellees seek to bypass the requirement that they be admitted as affected persons entitled to challenge the issuance of the permit before proceeding to judicial review of the permit. *Solis* does not support Appellees' contention.

Statutory prerequisites to suit against a governmental entity are jurisdictional. Tex. Gov't Code § 311.034. Participation in a contested case hearing is a jurisdictional prerequisite to judicial review of a Commission decision to grant an air permit. *See* Tex. Gov't Code § 2001.171; *Sierra Club*, 2016 WL 1304928, at *4 (court lacks jurisdiction when challengers do not exhaust all of their administrative remedies prior to judicial review). Appellees could only participate in a contested case hearing if they met the threshold requirement of establishing that they were affected persons under the statute. *See* Tex. Water Code § 5.556(c). Because Appellees did not meet that threshold, even under the Health and Safety Code provision on which they rely, they were required to participate in a contested case hearing in order to exhaust their administrative remedies. *See* Tex. Health & Safety

31

Code § 382.032(a) (giving appeal rights only to "person affected" by ruling or decision). We therefore lack jurisdiction to review whether the Commission erred in issuing a permit to Max Midstream. We sustain the Commission and Max Midstream's second issues on appeal.

### III. CONCLUSION

The trial court erred by substituting its judgment in place of the Commission's decision, which was supported by substantial evidence. We lack jurisdiction to review the merits of issuance of the permit. We therefore reverse the judgment of the trial court and render judgment that the order of the Commission is affirmed.


/s/ April Farris
April Farris
Justice


Before Chief Justice Brister and Justices Field and Farris.

32